**Vernon GLENN, Appellant,**

v.

**Gene GIDEL and the American National Bank of Amarillo, Appellees.**

No. 8199.

Court of Civil Appeals of Texas, Amarillo.

Feb. 7, 1972.

Phillip D. Hardberger, San Antonio, for appellant.

Culton, Morgan, Britain & White, Donald E. Jackson, Amarillo, for appellees.

JOY, Justice.

This is an appeal from a summary judgment rendered in favor of defendants American National Bank and Gene Gidel and against plaintiff Vernon Glenn in his suit for damages resulting from malicious misrepresentations alleged to have been made by defendants.

Reversed and remanded.

The plaintiff, Vernon Glenn, alleged in his petition that the defendant, Gene Gidel, acting in his capacity as an officer of the defendant The American National Bank of Amarillo, caused to be circulated a false report that the plaintiff and his brother were wrongfully removing truckloads of merchandise from the Gibson Stores in Amarillo, Texas. The plaintiff alleged that as a result of the false reports he was forced to sell his one-half interest in the Gibson Stores in Amarillo at a substantial loss. The defendants, Gene Gidel and the bank denied the allegations in plaintiff's petition, and alleged that if Gidel, acting either individually or as an officer of the bank, made such representations, then the representations were made to persons who had a business interest in the matters and same were privileged communications. The trial court severed the causes of action of the plaintiff against Gidel and the bank from other causes of action alleged against the other two defendants, Gibson Products Company, and H. R. Gibson, Sr., and granted a summary judgment to Gidel and the bank, decreeing that the plaintiff Vernon Glenn take nothing of these defendants.

Plaintiff Glenn has perfected appeal from the summary judgment on the ground that material issues of fact were raised by the pleadings and proof, and that therefore the granting of the summary judgment was improper.

In February of 1967, Gibson Products Company, plaintiff and his brother, J. B. Glenn, obtained a loan from The American National Bank in the amount of $300,000, fifty percent of which was guaranteed by the Small Business Administration. In August of 1968, Tony Grillo, a recently-discharged former employee of the plaintiff made certain statements to defendant Gidel, who in turn called in plaintiff's certified public accountant and the Small Business Administration loan officer in charge of protecting SBA's interest, in order that they might hear the former employee's statements. Soon thereafter, defendant Gidel told the members of the loan committee at the bank of Grillo's statements, and later Gidel told an investigator for the burglar alarm service which had been hired by plaintiff to protect the store. The evidence is controverted as to whether Gidel also spoke to Mr. Gibson, who sold the franchise to the plaintiff, with regard to these matters. Defendant contends that the above establishes that his statements were "qualifiedly privileged," as that term is explained at 36 Tex.Jur.2d, Libel and Slander, § 71 et seq. Where communications which are the subject of a lawsuit such as that before us are conditionally privileged, the law allows a recovery by the plaintiff if he proves that the defendant was prompted by malice or lack of good faith. See Dun and Bradstreet, Inc. v. O'Neil, 456 S.W.2d 896, 900 (Tex.Sup.1970) and Cheatwood v. Jackson, 460 S.W.2d 528, 531 (Tex.Civ.App.—Houston (14th Dist.) 1970, no writ). Actual malice, proof of which must be made to overcome a conditionally privileged communication, may be established by showing the communication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." Dun and Bradstreet, Inc. v. O'Neil, supra. The following portions of defendant Gidel's deposition are sufficient to raise an issue of fact as to malice, concerning (1) whether or not Gidel believed or did not believe the statements he heard, and (2) whether defendant Gidel acted in reckless disregard of whether the information was false or not, before he caused the information to be communicated to other parties:

"Q. * * * Well, I want to get this straight now, I mean was the substance of what he told you that they were not keeping good books or that they were stealing something? What impression were you left with?

"A. Well, it didn't make any particular impression on me, because I didn't —I didn't intend to go any further with it, even mentioning it to anybody, other than these people that I felt should know and let them make up their minds."

*      *      *      *      *      *

"Q. All right. Did he say that they were taking truckloads of merchandise out of there at night?

"A. He did not say that the Glenn boys were taking truckloads of merchandise out of there at night; he said there was some movement of merchandise from one store to another, and he said from what he could gather that some of the merchandise was not arriving at its proper destination.

"Q. What does that mean to you?

"A. He did not say that 'I suspect that it's ending up at some undetermined place.'

"Q. And what did that mean to you?

"A. It did not mean a thing to me.

"Q. Well, it must have had some effect about what he said, because you did determine that you were going to talk with two people about it.

"A. Yes, because I thought that those people should know, so that we could discuss it and decide what maybe should be done.

"Q. About what?

"A. Well, whether or not we wanted to proceed any further with—whether we wanted to talk to Tony more or talk to

other employees, or maybe turn it over to a private detective or investigator or something."

\*   \*   \*   \*   \*   \*

"A. The following day was the first of August, so it would have been on the morning of the second of August, because I had Garner Young and Bill McWhirter and—come in; we went down to the director's room, like Vernon said, and we had Mr. Grillo—didn't just happen; I called him to come, and I wanted them to hear the story from Tony Grillo, not from myself."

\*   \*   \*   \*   \*   \*

"A. Someone asked him if he had any idea where it was going, and he said 'No.'

"Q. And nobody pursued it any further than that?

"A. No.

"Q. It seems to me that would be an item of some curiosity, was nobody—did you not wonder where the merchandise was going yourself?

"A. Well, I suppose naturally I would have wondered, but I didn't—to me, I didn't think it was as serious as Tony was letting on to believe; I didn't believe everything that he said."

\*   \*   \*   \*   \*   \*

"Q. Did you believe this?

"A. Not necessarily, I didn't—in fact, I didn't give it any consideration at all when he first came in, because I have heard some of these things before, and I didn't—well, to tell you the truth, I just didn't know what to believe.

"Of course, you know, when you hear so much at one time, as Tony had to tell, there could also—you know, where there is smoke, there is fire sometimes, and so maybe some of it could possibly be true, but what part you never know, or how much you never know. I feel that most of Tony's doing was because he had a— evidently had an axe to grind with Vernon, and J. B., in some respect."

In our examination of the record on appeal from a summary judgment, we are not called upon to weigh the evidence or to resolve conflicts in the testimony, and we must grant every possible inference to the non-movant. Layne v. Darnell, 454 S.W.2d 474 (Tex.Civ.App.—Fort Worth 1970, writ ref'd n. r. e.). We believe that the above testimony was sufficient to raise a material issue of fact, to wit, the existence or non-existence of malice on behalf of the defendant Gidel.

Under these circumstances, it is our duty to reverse the summary judgment rendered by the trial court and remand the cause. Jackson v. Cheatwood, 445 S.W.2d 513 (Tex.Sup.1969).

Reversed and remanded.